THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    No. Cr. 15-0205 JH

HENRY LUJAN,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Henry Lujan's Motion to Suppress Statement (ECF No. 188). The Court held a hearing on the motion on November 24, 2015. Having considered the motion, briefs, evidence, and applicable law, the Court concludes that Defendant Henry Lujan's motion to suppress his statements must be granted under *Edwards v. Arizona*, 451 U.S. 477 (1981), and the statements he made on January 20, 2015, must be suppressed from the Government's case-in-chief at trial.

## I.    FACTUAL BACKGROUND

On or about October 29, 2014, robbers stole a safe from a Wal-Mart store in Albuquerque. November 24, 2015 Hr'g Tr. 12 (hereinafter "Hr'g Tr."). Albuquerque Police Department ("APD") Detective Geoffery Stone led the investigation of the robbery. *Id.* Surveillance video and still photographs taken from the video captured the robbery. *See id.*; United States' Hr'g Ex. 1-11.

On or about January 20, 2015, police arrested Henry Lujan near his house and transported him to the main police station, where at around 11:10 a.m. Detective Geoffery Stone and APD

Detective Koury Church interviewed him. Hr'g Tr. 13, 34; United States' Ex Parte Notice of Supp. Ex. to Henry Lujan's Mot. to Suppress Statements (hereinafter "Lujan Tr."), ECF No. 246 at 3 of 14. The detectives wore plain clothes and had their sidearm weapons holstered during the interview. Hr'g Tr. 21-22. At no time during the interrogation was Detective Stone physical or threatening, and at no time did he draw his weapon. Hr'g Tr. 21.

After informing Henry Lujan that he was there about the October robbery of a Wal-Mart and getting some personal identifying information from him, Detective Stone read him his *Miranda* rights.  *See* Lujan Tr., ECF No. 246 at 3-4 of 14; Government's Ex. 12. Henry Lujan responded affirmatively when asked whether he understood each right. *See* Lujan Tr., ECF No. 246 at 4 of 14; Government's Ex. 12. Detective Stone then asked, "Uh, keeping these rights in mind, do you wish to talk to me about the questions that I have for you today?" Lujan Tr., ECF No. 246 at 4 of 14; Government's Ex. 12. Henry Lujan responded, "Uh, I would like to know what kind of questions you have." Lujan Tr., ECF No. 246 at 4 of 14; Government's Ex. 12. Detective Stone replied that he wanted to talk about the robbery. Lujan Tr., ECF No. 246 at 4 of 14; Government's Ex. 12. Henry Lujan asked how they were referred to the robbery. Lujan Tr., ECF No. 246 at 5 of 14; Government's Ex. 12. Detective Stone explained that somebody brought it to their attention; it was the word on the street, so they wanted to get his side of the story. Lujan Tr., ECF No. 246 at 5 of 14; Government's Ex. 12.

The following critical exchange occurred next:

> Detective Stone: 'Cause someone could be pinning more stuff on you.
>
> Henry Lujan: But, like, the reason why I'm saying that is because I don't know how to read, so I'd rather like have a lawyer with me to help me, because I don't know how to read, and I don't know what I'm getting myself into.  You know, 'cause I'm dyslexia.

| | |
|---|---|
| Detective Stone: | Okay. |
| Henry Lujan: | Like I said, I never went to high school or nothing, so. |
| Detective Stone: | Okay. Well, I don't have anything for you to read. There is no reading involved.  All I'm doing is asking you questions. Now, obviously, if you want a lawyer, that is, that is your right. |
| Henry Lujan: | Yeah. |
| Detective Stone: | Okay? Um, but just to keep in mind, this is your one opportunity to do the right thing. |
| Henry Lujan: | Yeah, but I'd like to know more. Like- |
| Detective Stone: | You, would you like me to tell you what I know? |
| Henry Lujan: | Yeah. |
| Detective Stone: | About the robbery? |
| Henry Lujan: | Yeah. |
| Detective Stone: | Okay. So here's what I know, and I'll even show you. Are you still cool with that? |
| Henry Lujan: | Yeah. |
| Detective Stone: | Do you want me to show you and go over it without a lawyer present? |
| Henry Lujan: | Yeah. |

*Id.* at 5-6 of 14; Government's Ex. 12. No break in the conversation occurred after Henry Lujan said he would like to have a lawyer help him. *See* Government's Ex. 12.

Detective Stone then began showing Henry Lujan surveillance photographs from the robbery and Henry Lujan admitted that he was in the photograph. *See* Lujan Tr., ECF No. 246-1 at 7-8 of 14; Government's Ex. 12. As the interview progressed, he continued to implicate

3

himself, although he refused to identify the other participants. *See* Lujan Tr., ECF No. 246-1 at 7-10 of 14; Government's Ex. 12. At the end of the interview, Henry Lujan admitted to being a heroin addict since he was 11 years old, doing 90 bucks worth a day, and "getting sick" because he had not shot up since the prior day. *See* Lujan Tr., ECF No. 246-2 at 4-5 of 12; Government's Ex. 12.

The next day, on January 21, 2015, a federal grand jury indicted Defendant Henry Lujan, among others, for the October robbery of the Wal-Mart. *See* Indictment, ECF No. 16. On August 21, 2015, Henry Lujan filed a Motion to Suppress Statement (ECF No. 188) seeking to exclude his statements on the basis that the detectives took them in violation of *Miranda*. Henry Lujan argues that the detectives continued questioning him after he invoked his right to counsel and exploited his known weaknesses of illiteracy, his heroin addiction, the fact that he was under the influence of heroin, and his lack of mental capacity, rendering his confession involuntary. *See* Def.'s Mot. 7, ECF No. 188. The United States contends that Henry Lujan reinitiated the interview after invoking his right to counsel, he voluntary gave his statements free of coercion, and thus the interrogation did not offend the Fifth Amendment. *See* United States' Resp. 7-9, ECF No. 196.

## II.   ANALYSIS

All questioning of a suspect subject to custodial interrogation must end once he invokes his right to an attorney, until the attorney is present, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *United States v. Giles*, 967 F.2d 382, 386 (10th Cir. 1992) ("In *Edwards*, the Supreme Court expressly held that once an accused invokes his right to counsel, all questioning must cease until counsel is furnished, regardless of whether the accused is re-informed of his

rights."). If the police subsequently initiate an encounter in the absence of counsel, the suspect's statements are presumed involuntary, even where the suspect executes a waiver. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). This rule is designed to prevent police from badgering a suspect into waiving his previously asserted *Miranda* rights. *Id.* "The only exception to this bright-line rule is where the accused initiates the conversation with the police." *Giles*, 967 F.2d at 386.

The first step in the analysis is to determine whether the suspect has invoked his Fifth Amendment right to have counsel present at questioning. *Id.* at 385. To invoke this right, the suspect must have made "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *Id.* (quoting *McNeil*, 501 U.S. 171, 111 S.Ct. at 2209). Whether a suspect unambiguously requested counsel is an objective inquiry. *United States v. Santistevan*, 701 F.3d 1289, 1292 (10th Cir. 2012). In *Giles*, the Tenth Circuit affirmed that the district court's conclusion that a suspect's question of when he would be given an opportunity to talk to an attorney could reasonably be construed as a request for an attorney, even though he did not expressly request an attorney. *See Giles*, 967 F.2d at 385-86.

"Under *Miranda* and *Edwards*, however, an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Smith v. Illinois*, 469 U.S. 91, 91 (1984). In *Smith*, the Supreme Court determined that the suspect's answer, "Uh, yeah, I'd like to do that," in response to the question if he understood he had a right to consult with a lawyer and have a lawyer present with him during questioning, was clear and unequivocal. *Id.* at 93, 95-97. As the Supreme Court explained:

> Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these

circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.

The importance of keeping the two inquiries distinct is manifest. *Edwards* set forth a bright-line rule that all questioning must cease after an accused requests counsel. In the absence of such a bright-line prohibition, the authorities through badger[ing] or overreaching—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance. With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation. Using an accused's subsequent responses to cast doubt on the adequacy of the initial request itself is even more intolerable. No authority, and no logic, permits the interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all.

*Id.* at 98-99 (internal quotations, citations, and footnote omitted).

In this case, the Government admits Henry Lujan "was in uninterrupted *Miranda* custody from the time he invoked his rights until he gave his confession." United States' Resp. 4, ECF No. 196. The Government also has conceded that Defendant Henry Lujan expressed a desire for the assistance of an attorney in dealing with the interrogation and invoked his right to an attorney. *See id.* at 5 ("Here, once Lujan invokes his right to an attorney, the officer advises Lujan that that is his, i.e., Lujan's, right."). Indeed, Henry Lujan's statement must be construed as a request for an attorney: "I'd rather like have a lawyer with me to help me, because I don't know how to read, and I don't know what I'm getting myself into." *Cf. Giles*, 967 F.2d at 385 (concluding that suspect's question as to when he would be given an opportunity to talk to an attorney could be reasonably construed as request for an attorney's help).

Instead, the Government argues that this case fits within the *Edwards* exception – that Henry Lujan initiated further communication with the police and then unequivocally said he

6

wished to proceed without counsel. *See* United States' Resp. 4, ECF No. 196. "[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith*, 469 U.S. at 95.

The United States, however, acknowledges that it is "problematic" that Detective Stone stated, "Okay? Um, but just to keep in mind, this is your one opportunity to do the right thing." United States' Resp. 5, ECF No. 196. The Government cites to this Court's decision in *United States v. McCluskey*, 893 F.Supp.2d 1117 (D.N.M. 2012), and notes that this issue "is a close call." United States' Resp. 7, ECF No. 196. This Court's extensive analysis in *McCluskey* illuminates the issue here of whether Henry Lujan initiated further exchanges with Detective Stone:

> Thus, the question before the Court is whether McCluskey initiated further "communication, exchanges, or conversations" with Rominger after he invoked his right counsel. *See Edwards*, 451 U.S. at 485, 101 S.Ct. 1880. For guidance, the Court turns to decisions from the Supreme Court and the Tenth Circuit discussing similar issues. In *Edwards*, the defendant invoked his right to counsel, but the next morning detectives appeared at the jail, where the detention officer told the defendant that he "had to" speak with police and took the defendant meet with the detectives. *Id.* at 479, 101 S.Ct. 1880. Thus, *Edwards* presented a clear case where the defendant did not reinitiate further communication with police.
>
> In *United States v. Rambo*, 365 F.3d 906 (10th Cir. 2004), the defendant was taken into custody on suspicion of committing armed robberies, and his interrogation was videotaped. At the beginning of the interview, the officer told Rambo that a lot of the responsibility for the crimes would be on his shoulders, and that he did not want to put more responsibility on Rambo's female accomplice than need be. *Id.* at 908. After Rambo asked whether his accomplice would be released or remain in jail, the officer said, "I don't know. [pause] You know if you want to talk to me about this stuff, that's fine." *Id.* After Rambo inquired again about the welfare of his accomplice and her children, the officer again asked, "Do you want to talk to me about this stuff?" and Rambo responded, "No." *Id.* This was an unambiguous invocation of the right to remain silent. However, the officer did not terminate the interview. Instead, he responded, "You don't? [pause] OK. [long pause] That's fine. [pause] But that's what you're getting charged with." *Id.* The officer then proceeded to attempt to coax Rambo to talk by informing him

that other law enforcement agencies would be involved, and that "If you think back over the last two months since you've been out of prison, all the shit you've been involved in. Think about this. Think about the towns that are going to want to talk to you, ok? Or that have stuff on you." *Id.* At that point, Rambo began to talk about his lack of involvement in certain crimes, so the officer interrupted him and said, "Before we get into this stuff, Chris, I gotta know if you want to talk to me ... I can't sit here and talk with you like this if you don't want to talk to me. So do you want to talk to me?" *Id.* Rambo assented, and the officer informed him of his *Miranda* rights. *Id.* at 909. Then, Rambo confessed his crimes. *Id.* The Tenth Circuit rejected the government's contention that it was Rambo who reinitiated communication after invoking his right to remain silent:

> That argument ignores Moran's active role in continuing the interview after Rambo invoked his rights. When Rambo stated that he did not want to discuss the robberies, Moran made no move to end the encounter. Instead he acknowledged Rambo's request, but told Rambo that he would be charged with two aggravated robberies and that other agencies would want to speak with Rambo. Those comments reflect both further pressure on Rambo to discuss the crimes and a suggestion that despite Rambo's present request to terminate discussion of the topic, he would be questioned further.

*Id.* at 911. Thus, the Tenth Circuit concluded that the defendant's capitulation and agreement to talk to police was not at his own behest but rather was a product of the improper interrogation that continued after he invoked his right to silence. *Id.* That is essentially what happened in this case. Here, McCluskey unambiguously invoked his right to counsel both at the beginning and in the middle of the interview. In neither instance did Rominger terminate the encounter. Instead, he proceeded to attempt to elicit an incriminating response from McCluskey by urging him to make a statement that would protect Welch. And it was this persistent, improper continued interrogation that persuaded McCluskey to agree to talk if Welch told him to do so. To reach any other conclusion, this Court would have to "ignore [Rominger's] active role in continuing the interview after [McCluskey] invoked his rights."

The other cases the Government cites do not alter this conclusion. In *United States v. Glover*, 104 F.3d 1570, 1580–81 (1997), the Tenth Circuit held that the defendant's confession was admissible where the individual in custody, rather than the police, initiated further discussion after the defendant invoked his right to counsel. There, the police arrested Glover and advised him of his *Miranda* rights. *Id.* at 1575. Glover indicated that he did not want to talk, and the officers immediately ceased questioning him. *Id.* The police then questioned Glover's co-defendant, who was not in custody. *Id.* After obtaining her statement, one officer approached Glover but a second officer immediately intervened and reminded him that Glover had invoked his rights. When the officers began to discuss which

particular right Glover had invoked, Glover reminded them that he had invoked his right to silence, but then he stated that he now wanted to talk. *Id.* The officers began to interrogate him and did not readvise him of his *Miranda* rights. *Id.* The Tenth Circuit concluded that Glover, rather than the police, had initiated the further discussion that led to his confession. *Id.* at 1581. The Court reasoned that after Glover invoked his right to silence, police ceased all questioning and it was only later, after the confusion over which *Miranda* rights he had invoked, that Glover himself volunteered that he wished to talk. *Id.* This subsequent willingness to talk, the court noted, did not stem from improper interrogation by the police. *Id.*

….

*Edwards*, *Rambo*, *Glover*, and [*United States v. Alexander*, 447 F.3d 1290 (10th Cir. 2006)] persuade the Court that under the facts of this case, McCluskey did not validly reinitiate contact with Rominger after invoking his right to counsel. While it is true that it was McCluskey's own suggestion that he would talk if Welch told him to do so, he made that suggestion only after Rominger continued to interrogate him after he twice invoked his right to counsel. It is undisputed that McCluskey invoked that right and that, despite the invocation, Rominger did not terminate the encounter. As the Court has explained, Rominger continued not only to "explain the benefits of cooperation," (as the Government characterizes it), but also to interrogate McCluskey. It was only after—and as a result of—that continued interrogation that McCluskey offered to confess if Welch directed him to do so. It is this type of pressure to acquiesce that *Edwards* is intended to prevent….

…In that regard, this case is similar to *Rambo*, in which police did not terminate the interview when the defendant invoked his Fifth Amendment rights, but instead continued to interrogate him through means other than express questioning until he agreed to speak to them. Here, McCluskey did not agree to talk to Rominger at the direction of Welch until after Rominger improperly interrogated him.… Further, this case is distinguishable from *Glover* and *Alexander*. In both of those cases, unlike here, the police immediately ceased their interrogation when the defendant asserted his Fifth Amendment rights. In *Glover*, it was the defendant who, long after the interrogation ended, offered to speak to police. And in *Alexander*, the FBI ceased questioning the defendant when he asserted his rights, and his reinitiation of the interrogation was the product not of continued questioning, but of independent persuasion by his co-defendant.

*McCluskey*, 893 F.Supp.2d at 1140-43. This Court found a significant distinction between the cases in which the police immediately halt their interrogations after the invocation of *Miranda* rights, and the contrary situation in *McCluskey* in which the interrogation did not cease. *See id.* at 1143-44. The Court thus concluded that McCluskey did not initiate further conversation, as

required to avoid suppression under *Edwards*. *See id.* at 1144.

This case falls within the *Rambo*/*McCluskey* line of cases because Detective Stone continued the interview after Henry Lujan invoked his right to counsel. The Government contends that when Mr. Lujan said he "wants to know more," he was the one asking the questions, not Detective Stone. The self-acknowledged problem for the Government, however, is that Henry Lujan's request for more information occurred after he invoked his right to an attorney, and after Detective Stone pressed him that this was his opportunity "to do the right thing" – pressure to discuss the crimes and, like in *Rambo*, a suggestion that despite the request for counsel, he would be questioned further.

The United States asserts that this Court should instead rely on the case of *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), and conclude that Detective Stone did not violate the *Edwards* rule. In *Bradshaw*, after the suspect asked for an attorney, the "officer immediately terminated the conversation," and minutes later, when the suspect was transferred from the police station to the jail, he asked the officer what was going to happen to him now. *Id.* at 1042-44. In finding that the officer did not violate the *Edwards* rule, the Supreme Court noted that the suspect's question occurred prior to being subject to further interrogation. *Id.* at 1043-44. This case is distinguishable because Detective Stone did not stop the conversation before Henry Lujan expressed wanting to know more.

The Government also contends that "[t]he post-invocation statements of Detective Stone fall short of the coercion used in *Edwards*, *Rambo* and *McCluskey*," United States' Resp. 8, ECF No. 196, and that Detective Stone's conduct in this case was far less egregious, Hr'g Tr. 52-53. A significant degree of coercion or the egregiousness of police conduct, however, is not the standard to use after the invocation of the right to counsel. In *Rambo*, the officer merely coaxed

the suspect to waive his invoked right to silence, yet the Tenth Circuit suppressed Rambo's statements. *See Rambo*, 365 F.3d at 908-11. Rather than analyzing the degree of coercion, the Tenth Circuit focused on whether there was "some break in the interrogation." *Id.* at 911. Applying that analysis here, Detective Stone did not pause or suspend the interrogation after Henry Lujan invoked his right to counsel; rather, he played an active role in continuing the interview. Henry Lujan could not have reopened another conversation when the previous conversation begun by Detective Stone had not ended. Any pressure appears to be too much after the right to silence or request for counsel has been invoked. Instead, under the Supreme Court's "bright-line" rule in *Edwards*, police must scrupulously adhere to a request for counsel, stop the interrogation, and give space to a suspect to reinitiate the conversation on his own. Where police offer no break, the courts have found a Fifth Amendment violation. Accordingly, the Court must grant Defendant Henry Lujan's motion to suppress and will suppress the statements made by him during the January 20, 2015 interview from the Government's case-in-chief.

Defendant Henry Lujan also asserts his statements are "inadmissible for any use whatsoever, including cross-examination should Mr. Lujan eventually choose to testify at trial." Def.'s Mot. 8, ECF No. 188. In light of the absence of argument and authority supporting the parties' position on the use of the Henry Lujan's statement during any cross examination of him, at this time, the Court will not exclude absolutely the use of the interview during cross examination of Henry Lujan. The Court will thus reserve ruling on that particular issue.

**IT IS THEREFORE ORDERED** that Defendant Henry Lujan's Motion to Suppress **(ECF No. 188)** is **GRANTED** to the extent described herein.

_____
**UNITED STATES DISTRICT JUDGE**